**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SUSAN P. BRANTLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **5:03-CV-407 (CAR)** |
| **vs.** | : | |
| | : | |
| **THE CITY OF MACON, et. al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

### *ORDER ON MOTION FOR SUMMARY JUDGMENT*

Currently before the Court is Defendants' Motion for Summary Judgment.  [Doc. 25].  This employment discrimination action was brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et. seq.*, and 42 U.S.C. §§ 1981, 1983 and 1986. Herein, Plaintiff Susan Brantley complains that she was subjected to a racially hostile work environment while employed by Defendants, that her supervisors were made aware of the hostile environment but failed to take any meaningful action to remedy it, and that she eventually suffered a constructive discharge as a result of the discriminatory treatment.

Through the motion at bar, Defendants contend that Plaintiff's hostile work environment and constructive discharge claims fail as a matter of law because Plaintiff has failed to raise a material question of fact as to whether the alleged racial harassment was sufficiently "severe and pervasive" so as to support claims of hostile work environment and constructive discharge. Defendants likewise contend that Plaintiff's § 1986 claim fails because supervisors took prompt action when made aware of Plaintiff's complaints.

1

For the reasons discussed below, this Court finds that Plaintiff has in fact provided sufficient evidence to create a genuine issue as to whether her working environment was permeated with racial hostility, but has failed to provide sufficient evidence to establish that these circumstances were so intolerable that she was compelled to resign her position with the City.  The Court further finds that Plaintiff has failed to allege facts or identify evidence necessary to establish a viable claim under 42 U.S.C. § 1985, as necessary to sustain her § 1986 claim.  The present motion for summary judgment is accordingly **GRANTED** in part and **DENIED** in part.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.  See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party

2

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.  Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.   This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."  Celotex, 477 U.S. at 323.

## FINDINGS OF FACT

Plaintiff Susan Brantley, a white female, is a former employee of the City of Macon. Plaintiff began her employment with the City in December of 1992 and was promoted to the position of  "Grounds Maintenance Supervisor" in the Grounds Division of the Parks and Recreation Department in June of 2000.  Plaintiff worked in that supervisory position for almost three years, until she resigned her position on April 17, 2003.

On the day before Plaintiff submitted her letter of resignation, she met with the City's Compliance Officer, Martha Clifton, regarding the racial tensions in the Grounds

Division.  Although Plaintiff had made similar complaints to her direct supervisors, Larry Fortson (a white male) and Reggie Tabor (a black male hired in 2002), and to Michael Anthony, the Director of the Grounds Division (a white male), this was Plaintiff's first meeting with Ms. Clifton.  Two days later, on April 18, 2003, Clifton began an investigation into Plaintiff's complaints and learned that Plaintiff had resigned her position the day after her complaint was made.  Still, as a part of her investigation, Clifton interviewed Plaintiff; therein, Plaintiff complained about several incidents that had occurred over the course of her three-year period of employment in the Grounds Division. Plaintiff further complained that her supervisors, Michael Anthony and Reggie Tabor in particular, failed to take any meaningful action in response to her numerous complaints of racial harassment.

For example, Plaintiff complained to Clifton that, in the summer of 2000, just as she was hired in the Grounds Maintenance Superior position, a petition was circulated by some employees questioning whether Roy Smith, a black male and 18-year veteran of the Parks Department, should have been hired for the position instead of Plaintiff.  The petition specifically alleged that Plaintiff's hiring was an "act of favoritism on behalf of Nancy Dixon, a Parks Superintendent, and Michael Anthony . . . ," the Director of the Grounds Division.  Both Dixon and Anthony are white.  All the employees who signed the petition were black, and the petition was started by a black employee, Capus Wyche.  Plaintiff, however, did not initially attribute the petition to her race.  Thus, when she first learned of the petition, Plaintiff showed a copy of it to Fortson, the Assistant Director of the Department at the time but did not then complain that the petition was race-related.

4

Over the next year, Plaintiff noticed that the petition would re-appear on the bulletin board next to the time cards, in a location where she was sure to see it. She again complained to Fortson that the petition was back on the bulletin board.  Yet, because Plaintiff did not make any specific complaint about the petition being race-related, no formal action was taken by Fortson with regard to the petition.  Now, in retrospect and in light of other instances of racial hostility she experienced, Plaintiff believes that the petition was actually race-related.

In fact, shortly after Plaintiff began work as a supervisor in the Grounds Division, another incident involving the petition erupted.  Darrell Collins, a city laborer, complained that he was solicited by certain supervisors to make false statements about another worker, Hugh Edwards.  These supervisors apparently advised Collins that they wished to get Edwards fired because he refused to sign the petition (related to the hiring of Plaintiff) and that he was receiving preferential treatment from Nancy Dixon, a white supervisor.  These supervisors allegedly stated that Edwards was a "white kiss-ass," and one supervisor indicated that she wanted the "white b****" (referring to Dixon) "out of the office."  Because this incident occurred shortly after her arrival, Plaintiff was not involved in the investigation of the incident, but she later learned that Edwards was called a "white kiss-ass" because of his favorable relationship with a white supervisor.

Plaintiff also complained to Clifton that no action was taken against a black employee who refused to follow her instructions and that other black employees were often harassed when they did work or otherwise interacted with Plaintiff or other white supervisors.  The evidence shows that a black employee, Richard Stokes, in fact refused to

5

follow Plaintiff's instructions regarding the placement of signs on one occasion, despite the fact she gave him such instructions at least six times.  Although Stokes was not on her crew, Plaintiff issued a memorandum to Dixon, Stokes' actual supervisor, about the incident and requested disciplinary action.  Plaintiff did not specifically claim that Stokes' actions were racially motivated but did copy the memo to her direct supervisor, Reggie Tabor.  Tabor refused to take any action in the matter and stated that he believed it must have been a miscommunication.  Yet, Tabor did have a black female supervisor speak to all the crews about following instructions, regardless of which supervisor issued them.

Another black employee, Freddy Hall, further admitted that he was harassed by other black employees for interacting with Plaintiff because she was white.  Hall admitted that he refused to speak to Plaintiff on three occasions for fear that he would be picked on by his black co-workers.  Plaintiff did not supervise Hall but got along well with him and often saw him in passing.  When Plaintiff approached Hall about this behavior towards her, Hall told her that he was getting harassed by other black employees.  Hall further stated that he "couldn't do work for white folks because he got picked on."

Plaintiff spoke to Tabor and complained about Hall's refusal to speak to her.  Tabor spoke to Hall the day after Plaintiff complained and asked Hall if he was being teased about Plaintiff.  Hall admitted that he had been harassed for talking to or doing work for Plaintiff because of her race.  In response, Tabor warned Hall that he should be supportive of other employees, that he should not be concerned what other people say, and that action would be taken if it happened again. Tabor further instructed Hall to inform him if he continued

to be teased.  Following this counseling from Tabor, Hall did not refuse to acknowledge Plaintiff again.[1]

Plaintiff also complained to Clifton that she was subjected to personal insults and slurs and was the subject of a racially motivated rumor.  On two different occasions, Plaintiff was called "prejudiced" and a "white b****" by a black female facilities monitor, Pat DeShazier.  DeShazier admits that in November of 2002, she told other black employees that Plaintiff was "prejudiced."  Plaintiff complained to Tabor when she learned that this statement was made.  In response, Tabor spoke with DeShazier, telling her that he did not believe Plaintiff to be prejudiced, and warned DeShazier that it was inappropriate to make negative comments about other employees in the work place.  Tabor also explained to DeShazier that if something specific happened, which led her to come to the opinion that Plaintiff was prejudiced, it should be properly documented and addressed.  Tabor reiterated these instructions in a December 18, 2002 staff meeting.

Nonetheless, months later, Plaintiff learned that DeShazier had again made a derogatory remark about her.  In the spring of 2003, Ms. DeShazier was rumored to have chastised another black worker for reporting a family medical concern to Plaintiff and, in doing so, allegedly referred to Plaintiff as a "white b****."  Upon learning about this

---

[1]

        Another black worker, Larry Young, similarly admitted that he had been harassed for attending a lunch-time workout class, which was attended mostly by white workers and supervisors.  Young was told that "he shouldn't go over there with the white people and do exercise" and admitted that he was being picked on by other black employees for participating in the class.  This conduct, however, was discovered by Clifton during her investigation, did not involve Plaintiff, and there is nothing in the record to suggest that Plaintiff knew about this incident prior to her termination.  For these reasons, this evidence will not be considered evidence of a hostile work environment on summary judgment.

comment, Plaintiff again complained to Tabor, who questioned DeShazier about whether she had made another disparaging remark about Plaintiff.  Tabor did not use the specific language alleged when he questioned DeShazier, and this time DeShazier denied making the statement.  Tabor again informed DeShazier that it was inappropriate to speak to anyone that way and that relations with other employees should be cordial and supportive.  Tabor additionally warned DeShazier that use of such language could result in disciplinary action being taken against her.

On yet another occasion, Tabor informed Plaintiff of a rumor that she had referred to a previous black male supervisor as a "blanketly blank n***r boss."  Plaintiff denied ever making that statement and discussed the matter with Tabor, also a black male.  Plaintiff requested that Tabor put a stop to the rumor, and Tabor assured Plaintiff that he did not think that she was prejudiced.  No further action was taken by Tabor.

Aside from her difficulty with black subordinates and co-workers, Plaintiff also alleges that the overall quality of her working conditions and the quality of the work benefits offered to the workers on her grounds crew were impaired because she was white. Plaintiff specifically alleges that Christine Harmon, a black Grounds Maintenance Supervisor, received preferential treatment because she was not required to submit a flower spreadsheet to supervisors before planting like Plaintiff was and that Harmon was able to get the heavy equipment operator to her worksite more easily than Plaintiff could.  Plaintiff also contends that the crew supervised by Harmon received  higher quality equipment than her crew and was more likely to be compensated for overtime work.  Plaintiff even asserts that workers on her crew lost promotion opportunities based on her race.

8

These allegations are supported by the testimony of another white supervisor, who testified that white supervisors did in fact receive inferior equipment and that their crews were less likely to be compensated with overtime pay, despite the fact that they did similar work as those crews who worked for black supervisors.  Plaintiff did admit, however, that Christine Harmon, the black supervisor to whom she draws comparisons, was a thirty-year veteran of the Grounds Division and had a great deal more experience in planting than Plaintiff.  Plaintiff further admits that, because of her seniority, Harmon was assigned the downtown projects, which received higher priority, and that Harmon also complained about the quality of the equipment that she was issued.  Nevertheless, it is unclear whether Tabor took any action in response to Plaintiff's complaints about this alleged disparate treatment.

As such, when speaking with Clifton, Plaintiff additionally alleged that Tabor, her immediate supervisor, was indifferent to her complaints and actually aligned himself with the black workers in the department. The facts show that Tabor was hired as the assistant director of the Parks Department in July of 2002 in an effort to "smooth racial tensions between the nearly all-black Grounds Facilities Division and the two white supervisors." The City of Macon Council meeting minutes likewise reflect that the Parks Department was urged to fill the assistant director's position with a black employee before Tabor was hired.

Plaintiff was at first very happy about Tabor's arrival and hopeful that the new assistant would ease the racial problems in the Division.  However, Plaintiff became disheartened when, while acting as her supervisor, Tabor would speak to Plaintiff's black crew members and Ms. Harmon about Plaintiff's job but would not speak with her.  Tabor also refused to allow Plaintiff to use the purchase card, and once met with Plaintiff's crew to her exclusion, "shutting the door in her face."  Plaintiff additionally complains that, on

one occasion, Tabor asked her not to eat lunch with another white supervisor but nevertheless allowed black employees to routinely eat lunch together at the exclusion of the white employees.  Tabor even once suggested to Plaintiff that his loyalties remained with the black workers, because "he was the first black assistant director and . . . all [the black employees] looked up to him as their shining light."  Tabor also responded to Plaintiff's complaints on another occassion by telling her that she needed to be more "thick skinned."

Just prior to her resignation, Plaintiff had a final conversation with Tabor regarding the poor equipment her crews were given and the racial slurs directed against her.  Plaintiff then requested that Tabor "back her up" on these issues, but Tabor refused, telling Plaintiff that "backing up" a supervisor was "divisive."  It was this final comment which led to Plaintiff's decision to resign her position.  Plaintiff testified that she felt compelled to resign at that time because "nothing was done about her [previous] complaints . . . ", and when Tabor explained that to support her would be divisive, she felt "unwanted and unwanted because [she] was white."

It was at this point that Plaintiff filed her complaint with Clifton, the City's Compliance Officer.  The next day, April 17, 2003, Plaintiff submitted her resignation letter in which she stated that:

> I feel that my crews have suffered enough because of you being prejudice toward me.  They no longer have proper tools to work with, they are refused overtime when others aren't and they have lost chances for promotions.  I have let it be known to you that [Pat DeShazier] chastised one of my crew leaders because he called in to talk to me and not to her to inform me of his absence.  She told him he did not need to call the "white [b****.]"  Three times the heavy equipment operator has informed me that he gets picked on by others if he talks or does work for the white folks, I have reported this to you also. After reporting this to you he told me you and he had laughed about the situation. I am leaving here today because I mentally and physically can not continue working under these conditions.  I have gone to

10

EAS for 2 months to try to cope and my doctor has prescribed me Paxil to help me with stress.  I have now turned this over to the compliance officer and I only hope for those left in this division that you get your act together soon.

Thereafter, upon conducting all the necessary interviews in response to Plaintiff's complaint of racial harassment, Clifton issued a report on the matter.  Clifton ultimately found that there was "reasonable cause to believe that the atmosphere of the Grounds Division is racially charged and that this atmosphere has affected not only [Plaintiff] but also black employees who associate with white employees."  Yet, while Clifton found the general atmosphere in the Grounds Division to be "racially charged," she nonetheless concluded that Plaintiff's allegations were insufficient to support a racial harassment claim.  Clifton created the term "racially charged" because she did not feel that the allegations rose to a "racially hostile" level, but she did feel some obligation to acknowledge the racial tension and recommend corrective action be taken.

## CONCLUSIONS OF LAW

Plaintiff has now filed the present action alleging race discrimination under 42 U.S.C. § 1981, the Fourteenth Amendment of the United States Constitution (via 42 U.S.C. § 1983), and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, *et. seq*. Herein, Plaintiff alleges that she was constructively discharged from her position with the City of Macon as a result of repeated instances of on-the-job racial harassment.  Plaintiff additionally states a claim under 42 U.S.C. § 1986, alleging that Defendants violated this provision by failing to prevent the continued racial harassment she suffered despite their knowledge of such harassment. Plaintiff's Title VII claim, (Count III) is stated solely against Defendant City of Macon, while her civil rights claim under 42 U.S.C. § 1983

(Count I), is apparently stated against the City of Macon and the individually named defendants, Mike Anthony, the Director of the Parks and Recreation Department, Reginald Tabor, the Assistant Director of the City of Macon Parks Division, and Melvin Waldrop, the Chief Administrative Officer of the City of Macon.  Plaintiff's claims brought pursuant to 42 U.S.C. §§ 1981 and 1986 (Count II) are stated solely against the individual defendants.

## I.        Hostile-Environment & Constructive Discharge Claims.[2]

In this instance, Plaintiff complains to have suffered a constructive discharge as a result of the racially hostile environment she was subjected to while working in the Grounds Division.  A claim for hostile work environment may be "established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993)).  At a minimum, the plaintiff must show that (1) she belongs to a  protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was so severe and pervasive so as to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there

---

[2]

Plaintiff's hostile-environment and constructive discharge claims under §§ 1981, 1983, and Title VII are to be treated the same for the purposes of summary judgment. See Patterson v. McLean Credit Union, 491 U.S. 164, 185-87 (1989) (finding that the McDonnell Douglas framework for proving intentional race discrimination is applicable to § 1981 claims); Cross v. Alabama, 49 F.3d 1490, 1508 (11th Cir.1995) (holding that where § 1983 is used as a parallel remedy for a violation of Title VII, the elements of the causes of action are the same).

exists a basis for holding the employer liable for such environment under either a theory of vicarious or direct liability.  Miller, 277 F.3d at 1275.

However, to establish a "hostile-environment/constructive discharge claim," the plaintiff must establish something more.  A plaintiff who advances this type of claim must also "show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."  Pennsylvania v. Suders, 124 S. Ct. 2342, 2347, 2354 (2004).  Simply put, "[a] plaintiff . . . must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Id. Because constructive discharges are not always considered tangible employment actions, an employer may defend against this type of claim by asserting the Faragher/Ellerth affirmative defense and "showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventative or remedial apparatus."[3] Id. at 2347.

Here, Defendants do not seek to avail themselves of any affirmative defense; rather, they contend that Plaintiff's claims must fail because the harassment suffered by Plaintiff was neither sufficiently severe nor pervasive enough to be actionable as matter of law. Defendants are correct that a plaintiff seeking to prove the existence of a hostile work environment must establish that the harassing conduct created "both an objectively hostile

---

[3]
"This affirmative defense will not be available to the employer . . . if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions."  Suders, 124 S. Ct. at 2354.  Plaintiff did not suffer such an employer-sanctioned adverse action prior to her resignation in this case.  As such, Plaintiff's claims fall within that category of harassment claims which take place in the absence of a tangible employment action.

or abusive environment – one that a reasonable person would find hostile or abusive – and a subjective hostile or abusive environment – one that the victim subjectively perceives to be abusive." Swanson v. Civil Air Patrol, 37 F. Supp.2d 1312, 1324 (M.D. Ala. 1999) (citing Harris, 510 U.S. at 21-22 ).

There are four general factors which may be considered when determining whether a work environment was sufficiently hostile in this respect: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 584 (11th Cir. 2000) (citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc)).   Regardless, when making this determination, the district court is not to examine each of the employee's complaints in isolation; the court must "examine and consider all of the behavior and [racially motivated] conduct . . . collectively in determining whether it meets the sufficiently severe or pervasive requirement." Id. at 586.  In other words, "whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (internal quotes omitted).

Therefore, not all hostile remarks and conduct of which the plaintiff complains need be directed at the plaintiff in order to establish a viable hostile-environment claim. See Hudson v. Norfolk S. Rwy Co., 209 F. Supp.2d 1301, 1326 (N.D. Ga. 2001) (citing Edwards v. Wallace Comm. Col., 49 F.3d 1517, 1522 (11th Cir. 1995)).  Remarks and conduct targeted at others "may contribute to the overall hostility of the working environment." See id.  A plaintiff "may also support a claim of hostile work environment

14

by the use of harassing conduct she learned of through hearsay, so long as she was aware of the harassing incidents at the relevant time at which she alleges she experienced the hostile environment."  Id. (citing Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999); Schwapp v. Town of Avon, 118 F.3d 106, 111 (2nd Cir. 1997)).

In this case, Defendants attempt to address each of the incidents Plaintiff complains of individually and explain why each incident is not sufficient to support a hostile-environment claim.  This Court agrees that no one allegation of misconduct in this case is so severe as to entitle Plaintiff to relief.  "As the Supreme Court has stated, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  Hudson, 209 F. Supp.2d at 1325 (quoting Faragher, 524 U.S. at 788, 118 S. Ct. at 2283).  However, as stated above, this Court is not permitted to divide Plaintiff's allegations and weigh them either individually or in the categories Defendants have created.  Rather,

> courts are to consider "all of the circumstances" in determining whether a hostile work environment exists.  Under the "totality of the circumstances" approach, a district court should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode. . . .  [To do so] robs the incidents of their cumulative effect, and of course, when the complaints are broken into their theoretical component parts, each claim is more easily dismissed. . . .  To consider each offensive event in isolation would defeat the entire purpose of allowing claims based upon a "hostile work environment" theory, as the very meaning of "environment" is the surrounding conditions, influences or forces which influence or modify.

Jackson v. Quanax Corp., 191 F.3d 647, 660 (6th Cir. 1999) (internal quotes and citations omitted).  Accordingly, this Court must view Plaintiff's allegations in their totality to determine whether Plaintiff suffered pervasive *or* severe harassment because of her race.

In this case, there is no dispute that the working environment in the Ground's Division was "racially charged." It is undisputed that Tabor, Plaintiff's supervisor, was hired *because of* the openly acknowledged racial tension in the Grounds Division. The Director of the Grounds Division admitted as much, stating that he hired Tabor, a black male, in an effort to smooth the known racial tensions "between the nearly all-black Grounds and Facilities Division and the two white supervisors." Moreover, after a full investigation into the matter, Martha Clifton, Defendant's own Compliance Officer, concluded there was "reasonable cause to believe that the atmosphere of the Grounds Division is *racially charged* and that this atmosphere has affected not only [Plaintiff] but also black employees who associate with white employees." Defendants therefore concede at the outset that they have a serious race-relations problem in the Grounds Division and that the problem existed prior to Plaintiff's complaints. This concession alone is sufficient to raise a genuine issue as to whether Plaintiff suffered harassment "because of her race" while working in the Grounds Division.

Other evidence, as viewed in the light most favorable to Plaintiff, also suggests that the racial tension in the Grounds Division may have permeated the work environment. Black workers admit that they felt pressure not to socialize or work with the white supervisors, including Plaintiff. Plaintiff testified that it was accordingly difficult to get some black workers on site, and it is undisputed that, on at least one occassion, a black worker refused to follow Plaintiff's instruction, despite the fact that she repeated it at least six times. There is evidence that a petition was begun by black workers in response to Plaintiff's hiring – claiming that her promotion was the result of bias on the part of two white managers – and that this petition continually reappeared during Plaintiff's tenure in

16

the department.  Plaintiff also learned, while she was working in the Grounds Division, that she was personally called "prejudiced" and "white b****" by black co-workers, that a rumor circulated about her stating that she had referred to a black supervisor as a "n**** boss."  Each of these incidents occurred over a nine-month period.  Finally, Plaintiff's own supervisor, Tabor, refused to "back her up" when she complained of some of these issues, advised Plaintiff that she need to be more "thick skinned," and stated that all the black workers looked to him as their "shining light."  Upon consideration of this evidence, it appears to weigh in favor of Plaintiff.

However, in her brief on summary judgment, Plaintiff relies quite heavily on the "prejudiced," "white b****," and "n**** boss" references.  These statements are race related; yet, the Court must note that the statements, *standing alone*, are neither severe nor pervasive enough to support a claim of hostile environment.  It is well-understood that to sustain a claim of hostile environment based solely on racial comments made, such slurs "must be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'"  Hudson, 209 F.Supp.2d at 1325 (quoting EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990) and Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) ("'instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments' to constitute hostile work environment")).  The comments here do not rise to that level.

The Court must additionally note that Plaintiff's claims of disparate work conditions and overtime pay are not persuasively supported on summary judgment.  Plaintiff testified that her work conditions and the work conditions of her crews were adversely affected by racial tensions. Plaintiff contends, for example, that Christine Harmon, a black Grounds

Maintenance Supervisor, received preferential treatment – she was not required to submit a flower spreadsheet before planting, was able to get the heavy equipment operator to her worksite more easily, and received higher quality equipment for her crews. Plaintiff additionally alleges that Harmon's crew was more likely to be compensated for overtime work than crews working under white supervisors. Yet, Plaintiff simultaneously concedes that Harmon was a thirty-year veteran of the Parks Department with much more experience in planting than Plaintiff, that Harmon's downtown work sites actually had priority over her grounds projects, and that Harmon also complained about the quality of the equipment she was issued. Plaintiff further fails to support her claim of disparate overtime pay with any documentary evidence showing the disparities in the compensation.

The Court also finds that some of Plaintiff's complaints about Tabor's supervision fall short of establishing racial animus. Many of Plaintiff's complaints seem to stem from racially neutral managerial decisions. Plaintiff complains that Tabor would speak to others about her job and not consult her, that Tabor did not allow her to use the Division's purchase card, and that Tabor once met with Plaintiff's crew to her exclusion. These facts do not persuasively establish a racial animus; rather, it appears that Plaintiff simply disagreed with managerial choices made by Tabor. In fact, although Plaintiff complained that Tabor refused to allow her to use the Division's purchase card, she testified this decision was likely not related to her race because other white supervisors were allowed to use the card. Obviously, disputes about the propriety of race-neutral management decisions are not within the scope of Title VII. See Gupta, 212 F.3d at 587 ("Title VII is neither a 'general civility code' nor a statute making actionable 'the ordinary tribulations of the workplace.'"); Wright v. Department of Corrections, 31 F. Supp. 2d 1336, 1342 (M.D. Ala.

18

1998) ("An employment action taken against an employee is not adverse merely because the employee dislikes it or disagrees with it").

Nevertheless, in this case, the Court must ultimately decide whether all the evidence, when considered in its totality and not in isolation, is sufficient to merit a jury trial on Plaintiff's hostile work environment claim. Obviously, for the aforementioned reasons, this Court has doubts as to whether Plaintiff will succeed on this claim at trial; that being said, however, the Court will allow the claim to go forward. When considering the totality of the evidence presented by Plaintiff – especially in light of Defendants' own concession that the working environment was "racially charged" – this Court finds that Plaintiff has sufficiently raised a genuine issue as to whether the racial hostility in the Grounds Division was sufficiently pervasive in her working environment, such that she may proceed in her claims brought under Title VII, §1981, and the Fourteenth Amendment of the United States Constitution.

Plaintiff has shown that racial tension permeated the working environment in the Grounds Division. This tension affected both white and black workers. Management was well aware of the tensions, and dealing with these issues apparently became a daily part of work in the Grounds Division – even if it did not prevent Plaintiff from doing her job properly. See Miller v. Kenworth of Dothan, Inc, 277 F.3d 1269, 1277 (11th Cir. 2002) ("[The] harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable."). And, although Plaintiff's evidence on the equipment and overtime pay disparities is not impressive, Plaintiff has at least raised a question of fact on these issues by presenting the testimony of another white supervisor, which supports her claims that white supervisors were provided inferior equipment, as

compared to black supervisors, and that crews of white supervisors were not offered overtime pay, despite the fact that they did similar work as the crews for black supervisors who did receive overtime pay.  (See Depo. Michael Huffman, Sept. 8, 2004 at 10-15).  This evidence is additionally punctuated by the racial slurs Plaintiff suffered and the questionable comments and actions by Tabor.

Naturally, this Court must acknowledge that Plaintiff's complaints do not squarely fall within the clean factors as set forth above for determining objective severity or pervasiveness of harassment.  See Gupta, 212 F.3d at 584.  Nonetheless, in a case like the one at bar, the fundamental inquiry for the Court is whether Plaintiff has presented sufficient evidence to raise a genuine issue as to whether her workplace was "permeated with discriminatory intimidation, ridicule, and insult, . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  Miller, 277 F.3d at 1275.  Having considered the evidence at bar, the Court finds that Plaintiff has in fact identified the minimum necessary evidence to proceed with this claim.  Defendant's Motion for Summary Judgment is accordingly **DENIED** as to Plaintiff's hostile-environment claims.

This Court must next decide, therefore, whether Plaintiff has also produced sufficient evidence to raise a genuine issue regarding her allegations of constructive discharge.  A plaintiff seeking to state a constructive discharge claim must "show working conditions so intolerable that a reasonable person would have felt compelled to resign."  Suders, 124 S. Ct. at 2354 (2004).  In other words, the law does not consider a plaintiff's resignation to be voluntary "if quitting was the only way she could extricate herself from

. . . intolerable [working] conditions." <u>Perry v. Harris Chernin, Inc.</u>, 126 F.3d 1010, 1015 (7th Cir. 1997).

In this case, Plaintiff claims that she was forced to resign her position with the City because she could no longer work in the racially hostile environment her supervisors permitted.  In her letter of resignation, Plaintiff stated, "I am leaving here today because I mentally and physically cannot continue working under these conditions."  Plaintiff further testified that her resignation was triggered by Tabor's final lukewarm response to her complaints of racial tension and disparate provision of equipment to her crews, wherein Tabor refused to "back her up" and said to do so would be "divisive."

Yet, "[i]n assessing constructive discharge claims, [the Court is] . . . not to consider a plaintiff's subjective feelings about his employer's actions.  Rather, [the Court must solely] determine whether 'a reasonable person in [the plaintiff's] position would be compelled to resign.'" <u>Doe v. DeKalb County Sch. Dist.</u>, 145 F.3d 1441, 1450 (11th Cir. 1998) (quoting <u>Steele v. Offshore Shipbuilding, Inc.</u>, 867 F.2d 1311, 1317 (11th Cir. 1989)).

> [T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.  Every job has its frustrations, challenges and disappointments; these inhere in the nature of work.  An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.  He is not, however, guaranteed a working environment free of stress.

<u>Bristow v. Daily Press, Inc.</u>, 770 F.2d 1251, 1255 (4th Cir. 1985).

Moreover, as noted above, "[t]he threshold for establishing constructive discharge is quite high." <u>Hipp v. Liberty Nat'l Life Ins. Co.</u>, 252 F.3d 1208, 1231 (11th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1127 (2002).  "Before finding a constructive discharge, the Eleventh

21

Circuit requires 'pervasive conduct by employers' . . . and 'a high degree of deterioration in an employee's working conditions.'" Mangrum v. Republic Indus., Inc., 260 F. Supp.2d 1229, 1253 (N.D. Ga. 2003) (citing Hipp, 252 F.3d at 1231 and Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991)).  Thus, "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir.1992), aff'd, 511 U.S. 244 (1994); Mangrum, 260 F.Supp.2d at 1253 (noting that this standard is "higher than the standard for proving a hostile work environment.")(citing Hipp, 252 F.3d at 1231); see also Steele, 867 F.2d at 1316-18 (11th Cir.1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged); Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 905-06 (11th Cir.1988) (same).

Here, having considered the evidence in the light most favorable to Plaintiff, this Court cannot find evidence of working conditions so intolerable that Plaintiff could not have remained in her position while seeking redress through the City's Compliance Office. See Perry, 126 F.3d at 1015 ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").  Although Plaintiff may have been forced to work in an environment permeated by racial tension and hostility, Plaintiff has failed to point this Court to evidence establishing that she had any reason to fear for her safety, her mental or physical health, or her position.  For that matter, there is no evidence before the Court that the hostility alleged had any tangible effect on her job performance.

Certainly, Plaintiff testified that her crew was forced to work with inferior equipment and that her crew was not given overtime pay; however, neither of these conditions affected Plaintiff personally.  These conditions primarily affected her crew.  Plaintiff was apparently not denied overtime pay to which she was entitled; nor is there evidence that her grounds projects suffered because of the inferior equipment given to her crew.  Plaintiff did not produce any evidence that she was ever unable to complete a project or that she ever received negative job performance reviews.  Plaintiff does not even allege that her crew exhibited any resentment towards her because of the disparate treatment they apparently suffered.  Plaintiff was never stripped of authority and was never subjected or threatened with demotion or loss of status in the workplace.  C.f., Poole v. Country Club of Columbus Inc., 129 F.3d 551, 553 (11th Cir 1997) (finding issue of fact, precluding summary judgment for employer on constructive discharge claim, where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers").  As a result, Plaintiff has failed to provide sufficient evidence that there was "a high degree of deterioration in [*her*] working conditions." Mangrum, 260 F.Supp.2d at 1253.

In fact, Plaintiff admits that Christine Harmon, a black supervisor, shared in her complaints about getting proper tools and the heavy equipment operator on site for her crew.  Thus, while Plaintiff *may* have experienced problems that were somewhat greater than those of Harmon, she has offered no evidence that she had to overcome obstacles particularly unique to those in her position.  No reasonable person would find such circumstances "intolerable."  See Bristow, 770 F.2d at 1255.

23

Plaintiff likewise concedes that, although she was shunned by a black worker because of her race and that another black worker once refused to follow her instructions, neither of these events reoccurred after Tabor addressed the matters with the offending employees.  Nor is there evidence that Plaintiff had cause to believe that these events would nevertheless reoccur.  And while Plaintiff was subjected to racial slurs during the last nine months that she worked in the Grounds Division, as discussed above, none of these statements were alone so severe or pervasive enough as to give her cause to resign her position.

Thus, even construing the evidence in the light most favorable to Plaintiff, this Court can not find sufficient evidence as would allow a rational jury to conclude Plaintiff's working conditions were *so intolerable* that she was forced to resign.  Compare, Landgraf, 968 F.2d at 430 (finding that while the harassment suffered by plaintiff was substantial, it still did not rise to the level of severity necessary for constructive discharge); see also Brochu v. City of Rivera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002) ("[A] constructive discharge claim does not present a jury issue unless a plaintiff produces substantial evidence that conditions were intolerable.").  Defendant's Motion for Summary Judgment is therefore **GRANTED** with respect to Plaintiff's constructive discharge claim.[4]

---

[4]

Obviously, Plaintiff is not required to prevail on her constructive discharge claim to be entitled to relief on her hostile work environment claim.  Huddleston, 845 F.2d at 905.  "It is well-settled that a plaintiff who alleges discrimination by . . . harassment does not have to demonstrate a 'tangible loss' of an 'economic character' in order to prove a violation of Title VII."  Id.

## II.    Section 1986 Claim.

Through this action, Plaintiff additionally complains that the individual Defendants violated federal law, 42 U.S.C. § 1986, by failing to prevent the continued racial harassment she suffered despite their knowledge of such harassment.  "Section 1986 provides a cause of action against anyone who has 'knowledge that any of the wrongs conspired to be done, and mentioned in [42 U.S.C. § 1985], are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so.'" Park v. City of Atlanta, 120 F.3d 1157, 1159 (11th Cir. 1997) (citing 42 U.S.C. §1986). "Section 1986 claims are therefore derivative of § 1985 violations."  Id. at 1159-60.  In essence, "§ 1986 requires the existence of a § 1985 conspiracy."  Id. at 1160.

Section 1985 of course prohibits people from engaging in conspiracies "for the purpose or depriving, either directly or indirectly, any person . . . of the equal protection of the laws or of equal privileges and immunities under the laws . . . ."  42 U.S.C. § 1985(3). The individual defendants named in a § 1986 claim, however, need not be involved in the actual conspiracy violating § 1985.  Park, 120 F.3d at 1160.  In other words, while § 1986 clearly requires the existence of a § 1985 conspiracy, the statute does not require a showing that the defendants subject to the § 1986 claim actually "participated in that conspiracy or that they shared in the discriminatory animus with members of the conspiracy."  Id. "Section 1986 requires only that [the defendants subject to the claim] knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so."  Id.   Thus,  the  mere act or "neglecting or refusing to prevent a § 1985 conspiracy is actionable."  Clark v. Clabaugh, 20 F.3d 1290, 1298 (3d Cir. 1994); Park, 120 F.3d at 1160 ("negligence is sufficient to maintain a § 1986 claim").

Accordingly, in this case, if the individually named defendants "knew of a § 1985(3) conspiracy, were in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it, they are liable under § 1986." Park, 120 F.3d at 1160. The first question, therefore, is of what conspiracy did Defendant allegedly know? In her Complaint, Plaintiff alleges that Defendant "had knowledge of the wrongs conspired to be done to Plaintiff due to her race, and despite having the power to prevent or aid in preventing the commission of the same, neglected or refused to do so." (Compl. [Tab 1] at ¶ 24).[5] There is no evidence before the Court that Defendant Waldrop had any personal or constructive knowledge of any alleged wrongs Plaintiff suffered because of her race. Summary judgment in favor of Defendant Waldrop would therefore be appropriate.

Plaintiff has testified, however, that she personally complained to both Defendants Anthony and Tabor about the wrongs she allegedly suffered because of her race. Even so, the next question is whether Plaintiff has proven that these wrongs, if suffered, are sufficient to state a claim under § 1985(3). To state a successful § 1985 claim,

> a plaintiff must prove: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

Park, 120 F.3d at 1161.

Here, Plaintiff apparently complains that workers in the Grounds Division engaged in a conspiracy to harass and discriminate against her and other white supervisors, because

---

[5]

> No § 1985 claim is stated in the Complaint, and Plaintiff does not allege that either Anthony or Tabor were part of any § 1985 conspiracy.

of their race, and thus deprive Plaintiff of equal protection under the law.  Section 1985(3) constitutionally can and does protect against purely private conspiracies.  <u>United Broth. of Carpenters and Joiners of America v. Scott</u>, 463 U.S. 825, 833 (1983); <u>Griffin v. Breckenridge</u>, 403 U.S. 88 (1971)).  To prove such a claim of private conspiracy in violation of § 1985, "a plaintiff must show, inter alia, (1) that some racial, or perhaps otherwise class based invidiously discriminatory animus [lay] behind the conspirators action, and (2) that the conspiracy aimed at inferring with rights that are protected against private as well as official encroachment."  <u>Park</u>, 120 F.3d at 1161 (quoting <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. 263, 267-78 (1993)).

As this Court found above, Plaintiff has successfully raised a triable issue as to whether she was subjected to harassment from black co-workers because of her race; the first prong of this test has accordingly been met.  Yet neither party has addressed the issue of whether the right to be free of workplace racial harassment is the type of right which  § 1985 protects against both private and public infringement.  <u>See</u> <u>id.</u> at 1162 (noting that such rights include rights protected by the Thirteenth Amendment and the right of interstate travel but do not include the right to abortion or the right to free speech).  Upon its own review of the relevant law, this Court could not locate any previous case permitting a plaintiff to maintain a § 1985 claim against a group of co-workers who conspired to create a hostile work environment.

More importantly, Plaintiff has failed to allege facts or identify evidence necessary to establish a viable §1985 claim.  Plaintiff actually did not allege any § 1985 claim in her Complaint or assert the existence of any such claim in her response to Defendants' Motion for Summary Judgment.  Nor has Plaintiff pointed this Court to any evidence specifically

27

identifying the alleged members of the conspiracy or evidence of an act in furtherance of the alleged conspiracy.  Certainly, a plaintiff attempting to show the existence of a § 1985 conspiracy must show more than the existence of a hostile working environment.  See Park, 120 F.3d at 1161 (setting forth the elements of a § 1985 claim).  Inasmuch, the Court finds that Plaintiff has failed to raise a genuine issue as to whether Defendants had knowledge of a § 1985 conspiracy.  Because Plaintiff has failed to show Defendants had knowledge of a § 1985 conspiracy, Plaintiff's § 1986 claim must fail as a matter of law.  See e.g., Lawrence v. United Airlines, Inc., 2002 WL 1489536 *4 (N.D. Tex. July 10, 2002) (finding that plaintiff could not proceed with a claim under § 1986 without stating a valid claim under § 1985); Park, 120 F.3d at 1160 ("§ 1986 requires the existence of a § 1985 conspiracy.").  Summary Judgment is accordingly **GRANTED** in favor of Defendants as to Count II of the Complaint.

### III.     Claim for Punitive Damages.

On summary judgment, Defendants finally contend that Plaintiff is not entitled to recover punitive damages against either the City of Macon or the individually named defendants. As Defendants argue, punitive damages are not recoverable against a municipality under 42 U.S.C. § 1983.  See Murphy v. City of Flagler Beach, 846 F.2d 1306, 1309 n. 5 (11th Cir. 1988) ("punitive damages . . . are not recoverable against a municipality in a Section 1983 action") (citing City of Newport v. Fact Concerts, 453 U.S. 247, 261-62 (1981)).  Government entities are similarly "exempt from punitive damages under Title VII." Scott v. Estes, 60 F. Supp.2d 1260, 1274 (M.D. Ala. 1999); 42 U.S.C. § 1981a(b)(1). Accordingly Plaintiff is not entitled to receive punitive damages against Defendant City of

Macon in the event she prevails on either claim, and summary judgment is due to be **GRANTED** in this respect.

With respect to the civil rights claims against the individual defendants, it is well-settled that punitive damages are authorized if "the defendant was motivated by an evil motive or intent," or there was a "reckless or callous indifference to [plaintiff's] federally protected rights." Anderson v. City of Atlanta, 778 F.2d 678, 688 (11th Cir. 1985). In this case, Defendants argue that punitive damages may not be imposed against the individual defendants because Plaintiff has failed to raise a triable issue as to whether Defendants acted "intentionally, maliciously or recklessly." To support this argument, Defendants argue that Tabor addressed each of the concerns Plaintiff raised with him and that the incidents did not thereafter reoccur.

Plaintiff responds that punitive damages are in fact warranted in this case due to Defendants' "blatant indifference to [her] repeated requests for assistance and their repeated failure to provide it." As an initial matter, the Court notes that Plaintiff has failed to point to any evidence establishing that her complaints were made or made known to Defendant Waldrop. The Court accordingly finds that punitive damages would not be appropriately awarded against him; summary judgment should be so **GRANTED**. With respect to the claims against Defendants Anthony and Tabor, however, Plaintiff has raised a triable issue as to whether her supervisors demonstrated a "reckless indifference to her federally protected rights." Defendants have failed to show that Anthony took any significant action in response to Plaintiff's complaints. Plaintiff has further testified that Tabor expressly refused to "back up" Plaintiff when she asked for assistance. There is also some dispute as to what procedures and responses were required under the City's anti-discrimination policy

29

and whether Anthony and Tabor complied with that policy in response to Plaintiff's complaints of racial tensions and harassment.  For these reasons, Defendant's motion on punitive damages is **DENIED**.

**CONCLUSION**

For the aforementioned reasons, Defendants' Motion for Summary Judgment is hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED** this 9th day of May, 2005.

<u>**s/ C. ASHLEY ROYAL**</u>
C. ASHLEY ROYAL
United States District Judge

JLR/jec